# THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, appellants,

*v.*

# THE CENTRAL STOCK-YARD AND TRANSIT COMPANY, respondents.

A preliminary, mandatory injunction will be ordered only in case of extreme necessity.

---

On appeal from a decree advised by Vice-Chancellor Van Fleet, whose opinion is reported in *Delaware &c. R. R. Co. v. Central Stock-Yard Co., 16 Stew. Eq. 77.*

*Messrs. Bedle, Muirhead & McGee,* for appellants.

From the pleadings, it will be observed that the stock-yard company admit all the equities of the bill, and deny only that they are under any duty to receive live stock from the complainants.

They especially admit:

That large numbers of dealers in live stock and meat have offices and places of business at their yards.

That cattle are sent there in all ways.

That they are there fed, watered, cared for, sold and dealt in by large numbers of dealers.

That there a large portion of the meat supplies of New York, Jersey City, Hoboken and vicinity are handled and dealt in.

And that their stock-yards furnish a large part of the live stock business done in the port of New York.

That on Aug. 19th, 1887, they notified complainants that they would not receive live stock from them, and that they do refuse to receive any live stock transported over complainants's roads and consigned to shippers doing business at their yards, so long as complainants do not send there all the stock they carry.

That they do receive *from every other corporation and individual, and have so far not declined to receive from anybody else.*

That it is their intention to prevent transportation of any live stock to their yards, coming over the railroads of the complainants, unless they will give them all their business.

They raise two questions in the answer.

1. That they have the legal right to do, and refuse to do, business with whom they please.

2. That whatever may be their duty to shippers, they are not obliged to receive live stock from the complainants.

And, in the argument, they raise the further question that this court has no power to grant a mandatory injunction at the beginning of the suit.

I. The defendants are bound by law to receive live stock tendered to them at their yards by the complainants in any lawful manner.

In considering the questions at issue, the court must bear in mind, therefore, that these defendants are possessed by their charter :

1. Of all the powers of corporations generally.

2. Of the powers of railroad companies, steamboat companies and other common carriers, both by land and water.

3. Of the powers of inn-keepers.

4. Of very large public powers of a governmental nature.

5. And that they are chargeable with all the duties which these various corporations are charged with, and, besides that, with the duties which are laid upon all people who devote their property to a public use.

6. And that, by their conduct of their business, a usage has arisen to do business with the complainants and all other common carriers, to receive all live stock tendered by them, and that this usage has continued for years, and has been acted

upon and become a fixed part, and a large part of the busi-
ness of the whole continent. *Messenger* v. *Pennsylvania R. R.
Co.*, 8 Vr. 531; *Union L. & E. Co.* v. *Erie Ry. Co.*, 8 Vr. 23;
*Munn* v. *Illinois*, 94 U. S. 113; *Chicago, Burl. & Q. R. R. Co.*
v. *Iowa*, 94 U. S. 155; *Peik* v. *Chicago & N. W. Ry. Co.*, 94
U. S. 164; *Chicago M. & St. P. R. R. Co.* v. *Ackley*, 94 U. S.
179; *Olmsted* v. *Proprietors of the Morris Aqueduct*, 18 Vr.
311; *Balt. & O. R. R. Co.* v. *Adams Express Co.*, 13 Am. &
Eng. R. R. Cas. 455; *Fargo* v. *Redfield*, 18 Am. & Eng. R. R.
Cas. 463; *Wells, Fargo & Co.* v. *Oregon R. R. Co.*, 16 Am. &
Eng. R. R. Cas. 71; *Wells, Fargo & Co.* v. *Oregon Ry. & Nav.
Co.*, 16 Am. & Eng. R. R. Cas. 87; *Rhodes* v. *Northern Pac.
R. R. Co.*, 21 Am. & Eng. R. R. Cas. 31. [Annexed to this
case is a very important and valuable note on the question
of terminal facilities and discrimination, to which we particu-
larly call the attention of the court]; *McCoy* v. *C., I., St. S.
& C. R. R. Co.*, 13 Fed. Rep. 3; *Bennett* v. *Dutton*, 10 N. H.
481; *Thomp. on Carriers of Pass.* 2; see *Addison on Torts*
494; *Hawthorne* v. *Hammond*, 1 C. & K. 404; *Hull* v. *Jacques*,
6 C. & P. 725; *Rex* v. *Ivens*, 7 C. & P. 219.

The attention of the court will no doubt be called by counsel
for the stock-yard company to the *Express Cases, 117 U. S. 1.*

In those cases the supreme court overruled the decisions of
lower courts in three cases where mandatory injunctions had been
issued to compel railroad companies to carry express companies
in the peculiar manner which express companies desired to be
carried, namely, to take them upon passenger trains; to give them
parts of cars; to carry their packages without examination, and
to permit their messengers to remain in custody of the express
matter, and to accompany the same. But these cases were ex-
pressly decided upon the point that not only was no usage shown
to carry all express companies alike, but that a usage was shown
not to do so, and that it appeared by the case that, from the in-
ception of the express business, it had been the custom of each
railroad company to carry but one express company, and give as
the reason that express companies require peculiar, exclusive
facilities, and that the railroad companies could not conveniently

carry in that way more than one express company at a time, and that in all instances of which the court had knowledge, express companies had been carried upon express contracts made between the railroads and the express companies, and that the business was such as to make it more for the convenience of all concerned, and of the public, that it should be so, than would be the case if all companies could apply for such exclusive facilities without contract; but the case holds that the railroad companies would be bound to take from the express companies goods tendered by them in the same manner as by individuals, and there is nothing in the cases from beginning to end which is contrary to the principle contended for in the case at bar, or which overrules the principle on which the cases above cited were decided.

The *status* of express companies is held to be peculiar, and the only point decided is that they cannot, on general principles, demand the exclusive privileges they sought to obtain.

The case at bar differs from them in its essential character.

II. The court ought to grant a preliminary injunction, as prayed in the bill.

It has the power to do so.

1. The injury threatened is real and irreparable.

2. There is no unsettled question of law, and even if there were, the injury to complainants being irremediable, the court has power to grant the injunction asked.

3. The equities are admitted by the answer. There is no material question of fact in the case disputed.

4. Preliminary injunctions of this nature have been issued by courts of equity, generally, and by the court of chancery, and by this court whenever the right to restrain, the violation of which the injunction is asked for, is made out, and there is a present want of the use of the right.

5. The distinction between prohibitory injunctions and those that are called mandatory is very shadowy, at best, in this class of cases, and the use of terms does not affect the substance involved.

6. The relief at law is inadequate.

7. If the injunction prayed for be refused, this court will not

be able to put the complainants, if ultimately successful, back into the position they would have occupied if their rights had not been interfered with by the defendants, and this is the test upon which the question of granting this injunction must be determined.

8. The granting of the injunction prayed will do no harm to the defendants.

9. The complainants acted promptly. *Broome* v. *N. Y. & N. J. Telephone Co.*, 15 *Stew. Eq. 141; Whitecar* v. *Michenor*, 10 *Stew. Eq. 6; Rogers Locomotive Works* v. *Erie Ry. Co.*, 5 *C. E. Gr. 379; Thropp* v. *Field*, 11 *C. E. Gr. 82; Longwood Valley R. R. Co.* v. *Baker*, 12 *C. E. Gr. 166; Domestic Telegraph and Telephone Co.* v. *Metropolitan Telephone Co.*, 12 *Stew. Eq. 160*, 13 *Stew. Eq. 287; Russell* v. *Farley*, 105 *U. S. 433; 3 Pomeroy Eq. Jur. 391 § 1359; Virginia Coupon Cases*, 25 *Fed. Rep. 654; Board of Liquidation* v. *McComb*, 92 *U. S. 531; Pennsylvania R. R. Co.* v. *St. Louis, A. & T. H. R. Co.*, 6 *Sup. Ct. Rep. 1094; Bertenshaw* v. *Horngrove*, 7 *Pac. Rep. 270; Erhardt* v. *Boaro*, 113 *U. S. 537; Lanier* v. *Allison*, 31 *Fed. Rep. 100*.

III. A railroad company, a common carrier, may contract to forward or deliver goods beyond its own line. This is not *ultra vires.* The cases are all one way in favor of this proposition. *Lawson on Contracts § 234; Redfield on Carriers §§ 190–197; Hewitt* v. *Chicago, B. & Q. R. R. Co.*, 18 *Am. & Eng. R. R. Cases 568.*

*Mr. Leon Abbett*, for respondents, cited:

"*Express Cases*," 117 *U. S. 1; Lord* v. *Carbon Iron Co.*, 11 *Stew. Eq. 452, 458, 459; Rogers Locomotive Works* v. *Erie Railway Co.*, 5 *C. E. Gr. 379; Citizens' Coach Co.* v. *Camden Horse R. R. Co.*, 2 *Stew. Eq. 299; Long Branch Commissioners* v. *West End R. R. Co.*, 2 *Stew. Eq. 566; West Jersey R. R. Co.* v. *Cape May and Schellenger's Landing R. R. Co.* 7 *Stew. Eq. 164; Jersey City Gas Light Co.* v. *Consumers' Gas Co.*, 13 *Stew. Eq. 431.*

The opinion of the court was delivered by

BEASLEY, C. J.

This court concurs with the vice-chancellor, that the facts exhibited in the bill of complaint will not justify the allowance, *in limine*, of a mandatory injunction.

The case will be found fully stated in the opinion of the vice-chancellor, upon inspection of which it will appear, in the estimation of this court, that, at the present stage of the procedure, no such pressing necessity is shown to exist, as is requisite by a rule of practice that is perfectly established, as a basis for an application for the writ that is here sought. The appellant, by its own showing, is not absolutely excluded from these stock-yards; it is only prevented from delivering its cattle there in a certain mode. At an increased expense, it can obtain access to the yards as it formerly did, and this increased expense would plainly be recoverable from the respondent, in the event of a decision against it on the general merits of the controversy. There does not seem to have been any difficulty in putting the proceeding at once on final hearing. Under such circumstances, we cannot depart from the settled course of practice.

Let the decree be affirmed.


MAGIE, J. (*dissenting*).

The refusal of the preliminary injunction prayed for was put by the court below on two grounds: first, that the right claimed by appellant had never been settled at law; and second, that an injunction of a mandatory character, such as was asked for, ought not to issue before final hearing.

The majority of this court agree to the affirmance of the order refusing the injunction upon the ground that, under the circumstances disclosed in the pleadings, a mandatory injunction ought not to be allowed preliminarily.

I will briefly state the reasons why I am compelled to dissent from this conclusion:

When the injunction was refused below, the answer of respondent had been filed. From a perusal of the bill and answer, it is

quite obvious that the whole controversy between the parties was presented as fully as it will be on final hearing.

My associates here do not, therefore, base their affirmance upon the ground that such an injunction ought never to issue before final hearing, but rather on the special ground that it appears that appellant, if correct in respect to the right claimed, can obtain complete redress by action at law and by recovery of damages. This is said to be manifest from the facts charged in the bill, and admitted in the answer, that appellant formerly delivered cattle to respondent by means of connecting railroads; that appellant had refused to pay the increased charges demanded by those railroads, and been thus debarred from delivering cattle by rail to respondent. The inference my associates draw therefrom is that, by paying the increased price demanded, appellant can still forward cattle to respondent, and that respondent will then receive them, and, therefore, appellant, if driven to employ those railroads by respondent's refusal to receive its cattle otherwise, would be entitled to recover the additional price paid, which would fully compensate it.

But this obviously ignores the position assumed by respondent in the answer. The admitted refusal to receive cattle from appellant is therein justified—not on the ground that the cattle were not sent by rail, but on the ground that the cattle tendered by appellant were only part of those transported over its road. The claim of respondent (by the answer) is, that it is not bound to receive, and will not receive, any cattle from appellant, unless it receives all that are carried by it—in other words, it refuses to do any business with appellant, unless the latter can persuade or compel those who send cattle over its road to consign them to respondent's yard, and not elsewhere.

This, and not the transportation by the connecting roads, is the real ground on which the respondent stands and justifies its conduct. Such a justification, if good at all, will be good with respect to any cattle, whether delivered by rail or water. The answer avows, over and over again, the intent to reject cattle delivered by appellant, unless the latter will agree to deliver all its cattle to respondent.

Circumstances may be presented of so extraordinary a character as to justify the issue of a mandatory injunction *in limine.* If the whole case be before the court, and the right to the injunction clear, and if no injury is done to the party enjoined by its issue, but,. by its refusal, irreparable injury is done to the applicant, then it would not savor of equity to deny the injunction.

It is perfectly clear that respondent would not be injured by the injunction in the least degree. It would receive payment for the cattle delivered under it at precisely the same rates which are paid by others for the same services. The only effect upon respondent would be to compel it to relax the pressure it has put on appellant, whereby it seeks to compel appellant to contract to give respondent a monopoly of the cattle business over its road, a design which, considering that appellant is a common carrier, bound to transport and deliver cattle to whomsoever the shipper directs, seems not adapted to commend respondent to the favorable consideration of any court having regard to public policy and the legal rules affecting common carriers.

I think it equally obvious that the refusal of respondent will work irreparable damage to appellant. It must compel shippers, who desire to consign cattle to respondent's yards, to seek some other route. Traffic will be driven away from appellant's road, and cannot at once be regained, even if, on final hearing, respondent shall be adjudged to be in the wrong. It is a matter of common observation how traffic runs in accustomed lines, and, when diverted to new routes, can rarely, if ever, be regained. It is, moreover, obvious that, for this diversion, no 'adequate compensation could be awarded, for the amount of the injury could not be ascertained with any degree of certainty.

There remain, therefore, only the questions, whether the right claimed (and to protect which the injunction is sought) is clear, and whether the claimant is entitled to equitable relief. If these questions are to be solved in favor of appellant, I think the injunction, though mandatory, ought to have issued.

But these questions have not been considered by my associates. I do not deem it necessary, therefore, to express any opinion upon them. My intention has been only to express the grounds of my

Delaware, &c., R. R. Co. *v.* Central Stock-Yard Co.

dissent from the affirmance of the decree below, without consider-
ing the real merits of the controversy between the parties.

PATERSON, J. (*dissenting*).

A preliminary injunction was denied to the complainants
below, the appellants here, on the ground that a court of equity
could grant no relief in this case, until the rights claimed by the
complainants had been measured and determined by a legal tri-
bunal. This, as I understand, with an intimation further to the
effect that such rights might never be ascertained or settled, is
just the position in which the law in New Jersey in this respect
will become established, if that decision be affirmed here. For
one, I desire to place on record a decided dissent against the ap-
plication of such a principle of law, or justice, or equity, to the
circumstances disclosed in this matter.

The respondents cannot fail to accept, with eminent satisfac-
tion, an adjudication so favorable to the business in which they
are engaged. They are a corporation created by special legisla-
tion, vested originally with an extensive grant of powers and
privileges, supplemented in a short time by authority to establish
and enforce rules and ordinances, similar in police respects, to
that conferred upon a municipal government. It is apparent,
from the facts stated in the case, that this stock-yard company
are the proprietors of a business enterprise, large, increasing and
remunerative, the ramifications of which, by means of connec-
tions they can form with influential and wealthy common carrier
corporations, reach far beyond the river shore upon which their
works are located. It is evident, likewise, that these proprietors
can, and, if possible, intend to, control the particular interest re-
sulting from the exercise of their chartered rights, and, equally
so, that common carriers, the lines and branches of whose system
extend almost from lake to gulf, and eastern to the western ocean
tide, must submit to whatever terms they may see fit to impose.
It is conceded that the nature of the business of this company is
one in which the public have a large concern.

This, then, being so, and the respondents being vested by
their charter with a combination of powers that are not com-

mingled ordinarily in one great body or head centre, as it were, the exercise of a grant of authority so magnificent in proportion, and so rarely conferred by statutory law, must involve the performance of duties corresponding in magnitude and responsibility. Manifestly, too, some tribunal other than that to which it owes a legal existence, from the very nature of the case, should possess jurisdiction where an appeal for relief might be made to test the validity of questionable acts, the effects of which are so far reaching and overshadowing as must be here, if the claim of the respondents is sustained. A court of equity, certainly, is just the tribunal of all others that should be invoked to interpose. To await legislative action is not advisable, for many considerations other than the necessity of prompt remedial measures; the halls of legislation are open but seldom, the doors of equity always. When the respondents declare, as they do, fully and frankly in their pleadings, that they will not continue business relations with the appellants unless the latter carry all this especial trade to their stock mart, it is evidence of their power and determination to have and to hold everything in their particular line, or nothing. Sustained in this position by reason of a legal right, or the legal right of other parties and persons being unsettled, they will stand virtually above and beyond the jurisdiction of an ordinary judicial tribunal, and in this respect will remain free from limitation, and without restraint or check upon their ways or works.

This single consideration, to say nothing of the equities admitted in the answer, will determine my action in the premises. The business of the stock-yard is defined by the charter as being general in nature, and for the accommodation of the public. No subtle or shadowy distinctions of abstract right or remedies can avoid or destroy the plain meaning and force of those words. The respondents accepted the terms, and agreed to the conditions imposed. Now, when they come forward and claim that they are not bound to do and perform what they undertook, as prescribed in their charter, they should not be allowed to escape responsibility, either by ingenious refinements of law, or by reducing the rights and interest of the general public to a mere calcu-

Delaware, &c., R. R. Co. v. Central Stock-Yard Co.

lation of what all this is worth in pecuniary damages. It does seem to me that a power should be lodged somewhere to hold in restraint and curb the pretensions disclosed by the circumstances of this case, where discriminating powers are admitted to have been exercised, where every other remedy is inadequate, and the consequences may be so far reaching, perhaps destructive. Equity, to do full justice, must be vested with, or assume to itself, extraordinary powers, and, where a proper case is presented, as here, for the exercise of such powers, no hesitation should prevent a prompt application of the remedy. The latter should be as incisive and decisive as the acts, if unrestrained. Courts of justice, especially those administered on an equitable basis, come home to the habitation of every man, because those tribunals give security to person and protection to property. A citizen looks to these to guard and defend his rights from arbitrary encroachment and improvident or unwise legislation. Social life cannot attain the highest degree of civilization without the existence of a power of this controlling nature. A distinguished statesman, who participated in the formation of this government, declared, in one of the most memorable debates in the halls of federal legislation, that the authority for judicial construction of the great work he helped to fashion and to shape is derived from the constitution of man, from the nature of things, and the necessary progress of human affairs. The worlds of nature remain the same as then; but mark the mighty progress made in mind, in thought, and deep intelligence. The great discovery of life and light by the American philosopher, and destined, in the near future, to work such wonderful revolutions in the development of civilized energy and industry, had not been utilized to any great extent, and, measured by the expansive powers everywhere manifested now, steam might be described as limited to the boiling of a tea-kettle or other culinary purposes. What was the progress of human affairs in the second year of the present century, compared with the sight that statesman would behold if his eyes could look upon this busy, bustling age, when time is beaten in the race, and intellectual powers would seem almost to reach the *ultima thule* of finite perfection? To-day the

slopes and plains of the Pacific coast are pouring, literally, their wealth of blood and treasure in the shambles of these respondents, to mingle thence with the waters of the Atlantic seas. New conditions of business require extended remedies, and judicial progress must keep abreast of this new order of things. It is becoming more necessary with each advancing step, that, where positive authority is wanting, a court of equity, by virtue of a power inherent in its organization, should declare, in all cases, what the law is. With all due respect for those from whom I am constrained to differ, it does seem to me that, if the decision below is sustained, it will have very much the appearance of declaring what the law is not. My idea is that a full case for the exercise of the highest restraining power of a court of equity has been established, and that the decision below should be reversed.

For affirmance—The Chief-Justice, Dixon, Reed, Scudder, Van Syckel, Brown, Clement, McGregor, Whitaker—9.

For reversal—Depue, Magie, Paterson—3.